IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Kim Eugenia Sawyer, | ) | C/A No.: 1:12-2364-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

1

I.    Relevant Background

   A.    Procedural History

On April 2, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on June 11, 2008.  Tr. at 111–13, 119–22.  Her applications were denied initially and upon reconsideration.  Tr. at 52–53, 55–56.  On June 1, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Linda R. Haack.  Tr. at 33–51 (Hr'g Tr.).  At the hearing, Plaintiff amended her alleged onset date to January 9, 2010. Tr. at 18.  The ALJ issued an unfavorable decision on June 24, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 18–32.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 17, 2012.  [Entry #1].

   B.    Plaintiff's Background and Medical History

      1.    Background

Plaintiff was 54 years old at the time of the hearing.  Tr. at 37.  She completed high school and some college.  *Id.*  Her past relevant work ("PRW") was as a clerk, in data entry, and in tax resolution.  Tr. at 47–48.  She alleges she has been unable to work since January 9, 2010.  Tr. at 36.

      2.    Medical History

The record contains evidence dated prior to Plaintiff's January 2010 amended alleged onset date, including treatment notes showing that Plaintiff presented to Mary

Little, M.D., for routine medical care (Tr. at 230–40), and saw her psychiatrist, Peter Sukin, M.D., although Dr. Sukin's notes are largely illegible (*see* Tr. at 264–74, 276–86, 344).

In January 2010 (the month of Plaintiff's amended alleged onset date), Plaintiff went to the Summerville Medical Center and complained of back pain stemming from a fall six weeks earlier. Tr. at 253–58. Doctors diagnosed a sacral fracture and acute back pain, prescribed her Lortab and a walker, and advised her to follow up with an orthopedist. Tr. at 254–55.

Later that month, Plaintiff went to William Wilson, M.D., at an orthopedic center for her pain. Tr. at 228–29. Dr. Wilson noted some tenderness in her lower lumbar area and into her sacral area, as well as some weakness in her legs with movement. Tr. at 228. A CT scan of her lumbar spine showed evidence of bilateral sacral fractures, as well as evidence of inflammation (sclerosis), degenerative osteoarthritis (spondylosis), facet arthritis, and disc space narrowing. *Id.* Dr. Wilson diagnosed bilateral sacral fracture with underlying osteoporosis, recommended that Plaintiff continue to use her walker for support, and prescribed Lortab. *Id.*

After calling in for a refill of her pain medication, Plaintiff returned to Dr. Wilson the following month, complained of pain over her tailbone, and requested stronger pain medications. Tr. at 227. An x-ray of her pelvis and sacrum showed some abnormal shaping (angulation) and displaced bone fragments (rami). *Id.* Dr. Wilson diagnosed a healing pelvis fracture and discussed treatment options, but Plaintiff declined surgery. *Id.* Dr. Wilson prescribed Percocet. *Id.* Plaintiff saw Dr. Wilson again in March 2010

3

complaining of trouble walking due to pain in her sacral area.  Tr. at 226.  Dr. Wilson noted that a CT scan demonstrated a fracture through the S1–S2 region, but also noted that Plaintiff had no interest in surgery or in an evaluation by a trauma specialist.  *Id.*  The same month, Plaintiff saw Dr. Little, who noted that Plaintiff had swollen feet, had stopped eating and had lost weight, and had bed sores.  Tr. at 241–42.  Dr. Little started Plaintiff on an appetite stimulant and referred her for surgery for her bed sores.  *Id.*

Plaintiff saw Dr. Sukin in April 2010 and discussed diet-related issues.  Tr. at 387. She also saw Dr. Wilson that month, who noted that her pain seemed better, but that she had infected bed sores.  Tr. at 225.  Dr. Wilson again noted that Plaintiff's pelvis fracture was healing and encouraged her to walk with her walker despite her refusal to engage in physical therapy.  *Id.*  The next day, Plaintiff went to the Coastal Carolina Surgical Specialists ("CCSS") for decubitus ulcers (bed sores) on her sacrum and heels.  Tr. at 298.  Doctors there noted she had profound deconditioning due to depression, anorexia, immobility, and wasting (Tr. at 243–44), and performed an operation to debride the sores (Tr. at 259–62).

Plaintiff returned to CCSS for follow up on the surgery in May 2010 and stated that the sores were healing well.  Tr. at 295.  She returned again in June 2010 and doctors reported that the sores on her heels "look[ed] great."  Tr. at 292.

On June 7, 2010, Dr. Sukin completed a questionnaire regarding Plaintiff's mental condition.  Tr. at 275.  He noted her diagnosis as depression and that she had just started depression medication (Cymbalta).  *Id.*  Dr. Sukin indicated that Plaintiff was fully oriented; had slowed thought processes; had appropriate thought content; exhibited a

worried and depressed mood; and had poor attention and concentration, but adequate memory.  *Id.*  Dr. Sukin opined that Plaintiff had "very serious" work-related limitations due to her mental conditions, including that she was "extremely depressed" and was "too ill to work."  *Id.*

On June 11, 2010, Plaintiff saw Dr. Wilson for follow up on her sacral fracture. Tr. at 287.  He noted that she "seem[ed] to be doing better," was ambulatory without a walker or crutches, and should try to wean herself from the pain medication (Lortab).  *Id.* He also indicated that Plaintiff reported that her pain was worse at night or when she would lie down for a nap.  *Id.*  The same day, Plaintiff presented to CCSS for follow up on her bed sore surgery, and the doctor noted that she "ambulated to exam room today!!" Tr. at 291.  It was noted that while her right heel ulcer appeared smaller, the ulcer on her left heel had not changed much over the prior two weeks.  *Id.*

In July 2010, Plaintiff saw Dr. Sukin and reported a better appetite, but that she was sleeping a lot.  Tr. at 343.  She also went in for follow up on her bed sores, at which time doctors noted that she had made great improvement, had an increased appetite, was gaining weight, and had quit smoking.  Tr. at 290.  She was directed to keep moving and eating.  *Id.*

On July 23, 2010, Francis Fishburne, Ph.D., performed a mental status examination of Plaintiff in connection with her disability application.  Tr. at 304–07. Plaintiff reported to Dr. Fishburne that she spent a lot of time in bed watching television and reading, did not do any household chores, had problems leaving the house and did so only once per week, and was not bothered by crowds.  Tr. at 305.  She also reported

problems with concentration and memory. *Id.* A mental status examination showed that Plaintiff was oriented; had a flat affect and depressed mood; was able to count by 3s without difficulty; had attention, concentration, and short-term memory that were within normal limits; exhibited clear and goal-directed thinking; was able to perform simple mental arithmetic and verbal abstractive tasks; was of low average range intelligence; and displayed appropriate judgment, but had poor insight and some impulse control issues as evidenced by her alcohol abuse. Tr. at 306–07. Plaintiff stated that she experienced panic attacks every few days that lasted about 10 minutes and that she could control them with breathing. Tr. at 307. Dr. Fishburne diagnosed panic disorder and a history of alcohol abuse, and assigned her a Global Assessment of Functioning ("GAF")[2] score of 65. *Id.*

In late July 2010, Plaintiff returned to CCSS and doctors noted that her sores were "100% healed" on her right heel and sacrum, and that she still had a small open area on her left heel. Tr. at 347.

Also in late July, state-agency doctor Lisa Varner, M.D., reviewed Plaintiff's medical records and opined that Plaintiff had recurrent major depressive disorder, panic disorder, and a history of alcohol abuse. Tr. at 308–20. Dr. Varner opined that Plaintiff had moderate restriction of activities of daily living ("ADLs"); moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 318. Dr. Varner opined

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

that Plaintiff was able to understand, remember, and carry out simple (but not detailed) instructions; able to maintain concentration and attention for two-hour periods; that she may miss work occasionally due to psychological symptoms; that she would perform best in situations that did not require ongoing interaction with public; and that she was able to be aware of normal hazards and take appropriate precautions. Tr. at 322–24.

In August 2010, Adebola Rojugbokan, M.D., performed an orthopedic consultative examination of Plaintiff in connection with her disability application. Tr. at 326–33. Plaintiff reported that she was well until January 2010 when she fell in the bathroom. Tr. at 328. She stated that her pain progressively worsened and that she had ultimately seen Dr. Wilson, who informed her that she would not be a surgical candidate. *Id.* Since then, Plaintiff reported return visits every six to eight weeks for pain management. *Id.* She stated that her pain was constant at a level four out of ten, but was relieved with medications and did not seem to radiate. Tr. at 329. On examination, Plaintiff exhibited normal shoulders, elbows, wrists, knees, ankles, and hands; some tenderness, weakness, and limited range of motion in her hips and lumbar spine area; and an inability to tandem walk, heel-toe walk, or squat. Tr. at 330–33. Dr. Rojugbokan added that his review of Plaintiff's symptoms was essentially normal except for some pain in Plaintiff's tail bone (coccyx) area. Tr. at 329. He assessed status post hip fracture and lower back pain, and noted that Plaintiff had some difficulty walking. Tr. at 333.

On August 26, 2010, Plaintiff returned to CCSS for a checkup of her bed sores. Tr. at 346. Plaintiff denied any pain associated with the mostly-healed sores and reported that she was improving daily. *Id.*

7

In September 2010, Plaintiff saw Dr. Sukin again for medication management. Tr. at 343. Also that month, state-agency doctor Cleve Hutson, M.D., reviewed Plaintiff's medical records and opined that she could perform a range of light work, including that she could occasionally perform all postural movements, but should never climb ladders, ropes, or scaffolds and should avoid even moderate exposure to hazards. Tr. at 334–41. The next month, another state agency doctor, William Cain, M.D., also reviewed Plaintiff's medical records and also opined that she could perform a range of light work, including that she could frequently balance; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds, and had no other limitations. Tr. at 349–56.

In December 2010, R. Allen Lish, Psy.D., performed a mental evaluation of Plaintiff in connection with her disability application. Tr. at 357–60. Plaintiff reported that she could no longer work due to her depression and anxiety. Tr. at 357. Dr. Lish noted that Plaintiff's attention and concentration wandered at times, but that she displayed overall moderately good judgment and insight and had a generally flat affect. *Id.* He opined that she was of average intelligence, but that she struggled with her limited ADLs and had minimal social functioning skills. Tr. at 359. Dr. Lish diagnosed untreated alcohol abuse, depression disorder, dependent personality disorder, and assigned her a GAF score of 55. *Id.* Dr. Lish opined that it was highly unlikely that Plaintiff's functioning would improve, but added that if she attempted substance abuse treatment, psychotherapy, and vocational rehabilitation, her prognosis for improvement could change over time. Tr. at 360.

8

Later that month, state-agency psychologist Michael Neboschick, Ph.D., reviewed Plaintiff's medical records and opined that she had depression, anxiety (panic disorder), and alcohol abuse.  Tr. at 361–73.  Dr. Neboschick that Plaintiff had moderate restriction of ADLs; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 371.  He further opined that Plaintiff could understand and remember simple instructions; sustain attention for simple, structured tasks for periods of two-hour segments; adapt to changes (ideally infrequent and gradually introduced); make simple work-related decisions; maintain appropriate appearance and hygiene; recognize and appropriately respond to hazards; work in the presence of others in an uncrowded environment; accept supervision; and would work best in a solitary, slow-paced, low-volume situation that did not involve much direct, ongoing interaction with the public. Tr. at 375–78.

Plaintiff returned to Dr. Sukin in January 2011.  Tr. at 386.  In April 2011, Dr. Sukin completed an opinion regarding Plaintiff's work-related limitations.  Tr. at 379–84. In the opinion, Dr. Sukin noted that he had seen Plaintiff every two to three months since 2007; that she had a minimal response to medication, a depressed mood, an anxious affect, and no motivation; and that her prognosis was guarded.  Tr. at 380.  He noted her diagnosis was depression and assigned her a current GAF score of 54, but added that her highest GAF score in the past year was a 45.  *Id.*  Dr. Sukin went on to check boxes indicating that Plaintiff was either "unable to meet competitive standards" or had "no useful ability to function" in all 25 areas of work-related functioning.  Tr. at 382–83.  Dr.

Sukin added that it was "quite bad" for Plaintiff to leave her home and that she would likely miss more than four days of work per month.  Tr. at 383–84.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on June 1, 2011, Plaintiff testified that she lived with her parents. Tr. at 37.  She stated that she had not driven since 2008 because of her panic disorder, and testified that she was incapable of working "simply because of [her] nerves."  Tr. at 37, 43.  She said she lost her job in 2008 because she was unable to meet increased production goals.  Tr. at 38, 41.  She stated that she would be unable to hold a clerical job because of her severe back pain, panic disorder, and inability to pay attention to details. Tr. at 43.  She testified that she had ongoing back pain due to her sacrum fracture, and, when asked about medical records showing that her sacrum fractures were 100% healed, she said that her back still hurt.  Tr. at 44–45.  She also said she had problems walking due to residual soreness from her bed sores on her heels.  Tr. at 45.  Plaintiff estimated she could sit for an hour at a time before needing to change positions.  Tr. at 44.

During the hearing, Plaintiff stated that she drank a couple of beers with her friend on the weekend.  Tr. at 38.  In response to follow-up questioning by the ALJ, however, she stated that she was not telling the truth and that she drank a couple of beers each night.  Tr. at 38–39.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Art Schmitt reviewed the record and testified at the hearing.  Tr. at 47.  The VE categorized Plaintiff's PRW as a clerk as light, semi-skilled work; in data entry as sedentary, semi-skilled work; and in tax resolution as light, semi-skilled work.  Tr. at 47–48.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could sit for six hours in an eight-hour day with normal breaks; stand and walk two to four hours in an eight-hour day for approximately 30 minutes at a time with the freedom to change positions; and lift, push, and pull 20 pounds occasionally and 10 pounds frequently.  Tr. at 48.  The hypothetical individual was further limited to avoiding climbing ropes, ladders, and scaffolds; performing all other postural activities occasionally; avoiding unprotected heights and dangerous, moving machinery; performing simple, routine, repetitive tasks with infrequent and gradual changes in a stable environment; avoiding interaction with the general public; avoiding working in close proximity to more than one or two co-workers; and performing at a slow pace with a low production volume.  *Id.*  When asked whether there were any other jobs that the hypothetical person could perform, the VE identified the jobs of tobacco sampler and coupon recycler.  Tr. at 49.  The VE stated that the freedom to change positions was not consistent with the Dictionary of Occupational Titles, but that, based on his experience, the jobs he identified could be performed with a sit/stand alternative.  *Id.*  Upon questioning by Plaintiff's counsel, the VE testified that all jobs in the national economy would be eliminated if the hypothetical individual missed more than four days of work per month; was unable to cope with slow, gradual changes during the workday; and was

easily distractible and unable to maintain any concentration even to do simple, repetitive tasks.  Tr. at 50.

### 2. The ALJ's Findings

In her decision dated June 24, 2011, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
2. The claimant has not engaged in substantial gainful activity since January 9. 2010, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: status post sacral fracture and depression (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift, carry, push and pull up to 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8-hour day with normal breaks, stand and walk for 2 to 4 hours in an 8-hour day, (approximately 30 minutes at a time), except she: should have the freedom to change postural positions; should avoid climbing ropes, ladders and scaffolds; can occasionally perform other postural movements; should avoid unprotected heights and dangerous moving machinery; is limited to simple, routine, repetitive tasks, with infrequent and gradual changes in a stable environment; should avoid interaction with the general public; should avoid working in close proximity to more than 1 or 2 coworkers; and should be permitted to work at a slow pace producing low volume.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7. The claimant was born on January 9, 1957, and was 53 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 9, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–32.

## II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to consider all of Plaintiff's impairments and failed to consider the combined effect of her impairments on her ability to work; and

2) the ALJ did not properly evaluate the opinion of Plaintiff's treating physician.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.  Legal Framework

#### 1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Severe Impairments

Plaintiff contends that the ALJ erred in assessing her severe impairments because the ALJ failed to address Plaintiff's osteoporosis, hip and pelvic fractures, and panic disorder. [Entry #12 at 5–6]. The Commissioner responds that the ALJ's finding of "status post sacral fracture" as a severe impairment encapsulated Plaintiff's complaints of hip and back pain. [Entry #13 at 11]. The Commissioner further responds that Plaintiff

has not satisfied her burden of showing that anxiety was a severe impairment and, even if the ALJ did err in her step two analysis, any error was harmless because the ALJ considered all of Plaintiff's impairments at later steps of the sequential evaluation. *Id.* at 12–13.

a.     Osteoporosis and Fractures

The parties dispute whether the ALJ's finding that Plaintiff had the severe impairment of status post sacral fracture adequately addresses Plaintiff's osteoporosis and hip and pelvis fractures. As the Commissioner notes, the sacrum is "the part of the vertebral column that is directly connected with or forms a part of the pelvis and in humans consists of five fused vertebrae." [Entry #13 at 11 (citing the Merriam-Webster dictionary)]. The records in this case, including a CT scan, repeatedly indicate that Plaintiff experienced a sacral fracture or "bilateral sacral fractures." Tr. at 228, 254, 287. Although Plaintiff contends that the ALJ did not "explain or in any way state what encompassed Plaintiff's 'status post sacral fracture,'" the undersigned finds that such an explanation was unnecessary. The plain meaning of the ALJ's finding was that Plaintiff had previously suffered a sacral fracture and the records support this finding.[5]

Plaintiff contends that the record also supports diagnoses of osteoporosis and hip fractures that the ALJ should have considered in her analysis at step two. With regard to osteoporosis, Plaintiff cites to a CT scan demonstrating bilateral sacral fractures with

---

[5] To the extent Plaintiff asserts that the ALJ erred in failing to address her pelvic fracture, the undersigned finds the argument unavailing. The record and the ALJ's decision interchangeably reference "sacral fracture" and "pelvic fracture." In addition, the definition of sacrum provides that the sacrum is a part of the pelvis.

underlying osteoporosis. [Entry #12 at 6].[6] While osteoporosis may have been identified as the underlying cause of Plaintiff's sacral fractures, osteoporosis is not mentioned elsewhere in the records and was not diagnosed with objective testing. Furthermore, other than her sacral fractures, Plaintiff has identified no limitations resulting from her alleged osteoporosis. Because the ALJ considered Plaintiff's sacral fractures at step two and in assessing her RFC, the undersigned recommends a finding that the ALJ did not err in failing to specifically discuss osteoporosis in her decision.

Plaintiff similarly relies on a single record to argue that the ALJ erroneously omitted discussion of Plaintiff's alleged hip fractures. [Entry #12 at 6]. She references the record of orthopedic consultant Dr. Rojugbokan, who assessed Plaintiff as "status post hip fracture." Tr. at 333.[7] There is no other evidence of hip fracture in the records and Dr. Rojugbokan's own records repeatedly reference a sacral or pelvic fracture. Tr. at 328. Thus, the record referencing a hip fracture appears to be in error and the undersigned recommends a finding that the ALJ reasonably omitted discussion of such an impairment from her decision.

### b.     Panic Disorder

Plaintiff also argues that the ALJ failed to consider the consulting psychiatrists and psychologists' opinions that Plaintiff's mental impairments included a panic disorder and a personality disorder. [Entry #12 at 6]. The Commissioner concedes the existence of these diagnoses, but contends that a diagnosis alone is insufficient to establish that an

---

[6] The record Plaintiff cites is incorrect; however, Dr. Wilson's note from January 27, 2010, documents such findings. *See* Tr. at 227–28.

[7] Plaintiff appears to have mistakenly cited to page 326 of the transcript.

impairment is severe. [Entry #13 at 12]. The Commissioner also notes that Plaintiff's treating psychiatrist, Dr. Sukin, diagnosed Plaintiff with only depression. *Id.*

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. §§ 404.1508, 416.908. It is the claimant's burden to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).

Plaintiff has offered no evidence to prove that her panic disorder or personality disorder limit her ability to complete basic work functions. Thus, the undersigned recommends a finding that Plaintiff has failed to meet her burden of producing evidence demonstrating the severity of these alleged impairments. *See* 20 C.F.R. §§ 404.1512(c), 416.912(c).

Furthermore, to the extent that the ALJ may have erred in finding Plaintiff's panic disorder to be non-severe, Plaintiff has suffered no harm. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his

initial error"). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that she considers that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009). Here, the ALJ properly considered Plaintiff's alleged anxiety and panic disorder in determining her RFC. Tr. at 23–31.

### c.     Combined Impairments

As a corollary to her severe impairments argument, Plaintiff argues that the ALJ did not adequately consider the combined effect of her impairments. [Entry #12 at 7–8]. When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments).

Plaintiff's argument, however, is a restatement of her severe impairments argument. Specifically, Plaintiff argues that because the ALJ used the term "status post sacral fracture" and did not discuss Plaintiff's anxiety and personality disorders, it is not possible to determine if the ALJ considered the combined effect of these impairments. [Entry #14 at 2]. For the reasons set forth in the preceding sections, the undersigned recommends that Plaintiff's combined impairment argument be disregarded. To the extent Plaintiff more generally argues that the ALJ did not properly assess the combined effect of Plaintiff's impairments, the undersigned notes that the ALJ provided a thorough discussion of Plaintiff's combined impairments at step three of the sequential analysis. *See Brown v. Astrue*, No. 10–1584, 2012 WL 3716792, *6 (D.S.C. Aug. 28, 2012) ("[T]he adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments.") (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. Aug. 14, 1995)).

### 2. Treating Physician

Plaintiff also argues that the ALJ did not properly evaluate the opinions of Dr. Sukin. [Entry #12 at 8–11]. The Commissioner responds that the ALJ reasonably discounted Dr. Sukin's opinions because they were inconsistent with the record and with Dr. Sukin's own treatment notes. [Entry #13 at 15].

If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight. SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable

21

clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking a review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because the court's role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

On June 7, 2010, Dr. Sukin completed a questionnaire regarding Plaintiff's mental condition. Tr. at 275. He noted her diagnosis as depression and that she had just started

depression medication (Cymbalta). *Id.* Dr. Sukin indicated that Plaintiff was fully oriented; had slowed thought processes; had appropriate thought content; exhibited a worried and depressed mood; and had poor attention and concentration, but adequate memory. *Id.* Dr. Sukin opined that Plaintiff had "very serious" work-related limitations due to her mental conditions, including that she was "extremely depressed" and was "too ill to work." *Id.*

In April 2011, Dr. Sukin again opined regarding Plaintiff's work-related limitations. Tr. at 379–84. In the opinion, Dr. Sukin noted that he had seen Plaintiff every two to three months since 2007; that she had a minimal response to medication, a depressed mood, an anxious affect, and no motivation; and that her prognosis was guarded. Tr. at 380. He noted her diagnosis was depression and assigned her a current GAF score of 54, but added that her highest GAF score in the past year was a 45. *Id.* Dr. Sukin went on to check boxes indicating that Plaintiff was either "unable to meet competitive standards" or had "no useful ability to function" in all 25 areas of work-related functioning. Tr. at 382–83. Dr. Sukin added that it was "quite bad" for Plaintiff to leave her home and that she would likely miss more than four days of work per month. Tr. at 383–84.

With regard to Dr. Sukin's June 2010 opinion, the ALJ found that the opinion was vague and provided little insight into the claimant's specific functional limitations and abilities. Tr. at 27. Plaintiff contends the ALJ's vagueness finding was unreasonable because the questionnaire that Dr. Sukin completed was sent him by the Disability Determination Service ("DDS"). [Entry #12 at 9]. While the undersigned agrees that it

makes little sense to discredit Dr. Sukin's opinion as vague when the questionnaire was provided by DDS, the ALJ provided numerous reasons for discounting Dr. Sukin's April 2011 that apply equally to the June 2010 opinion. Thus, to the extent the ALJ erred in concluding Dr. Sukin's June 2010 opinion was too vague, the undersigned recommends a finding that any error was harmless in light of the ALJ's evaluation of the April 2011 opinon. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

With regard to Dr. Sukin's April 2011 opinion, the ALJ stated the following:

> Dr. Sukin's assessment of the claimant with a GAF score indicating no more than moderate limitations is internally inconsistent with the remainder of his report, which describes severe functional limitations. His indication that the claimant would be capable of managing funds in her own best interest also seems inconsistent, considering the severe functional limitations indicated in this report. Further, the course of treatment reflected in Dr. Sukin's treatment notes is inconsistent with what one would expect if the claimant were as severely limited as the doctor has reported. Additionally, the doctor has apparently relied quite heavily on the claimant's subjective report of symptoms and limitations, accepting most, if not all, of the claimant's allegations as true. As explained elsewhere in this opinion, there exist good reasons for questioning the reliability of the claimant's reports. Although Dr. Sukin is the claimant's treating physician, his report appears to contain internal inconsistencies, is inconsistent with the course of treatment reflected in the medical evidence, and is apparently based in great part on the claimant's subjective allegations. The doctor's opinion is accordingly less persuasive.

Tr. at 30.

Plaintiff argues that the ALJ's reliance on the GAF score was unreasonable because Dr. Sukin's report also noted a GAF score of 45 within the previous year. [Entry #12 at 10]. While it is true that the opinion referenced a GAF score of 45, a review of the

language reveals another inconsistency in the report.  The report provides that Plaintiff's GAF score at the time of the report was 54 and that her highest GAF score in the past year was 45.  Tr. at 380.  It appears that Dr. Sukin erred in completing the report as the highest GAF score in the previous year should have been 54 at a minimum.  Furthermore, Dr. Sukin described severe functional limitations existing at the time of the report, simultaneous with the GAF score of 54.  Thus, the undersigned concludes that the ALJ's comparison of the GAF score of 54 with the functional limitations described by Dr. Sukin was not in error.

Plaintiff further argues that the reasons articulated by the ALJ for discounting Dr. Sukin's April 2011 opinion "are not persuasive and are not supported by fact."  [Entry #12 at 10].  However, Plaintiff fails to identify specific evidence contradicting the ALJ's findings.  The ALJ articulated several valid reasons for discounting Dr. Sukin's opinions, and the undersigned's review of the record supports the ALJ's findings.  Thus, the undersigned recommends finding that the ALJ reasonably discounted Dr. Sukin's opinions.

To the extent Plaintiff argues that the ALJ should have addressed each of the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d), this argument also fails. Although the regulations provide factors that an ALJ must consider when evaluating a medical opinion, nothing in the regulation requires express discussion on a factor-by-factor basis.

For the foregoing reasons, the undersigned recommends a finding that the ALJ did not err in her treatment of Dr. Sukin's opinions.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

December 5, 2013                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).